Whenever you're ready. Take your time to get yourself organized. We'll let you know whenever you're ready, we're ready. May it please the court. I am Rebecca Fulmer and I, along with my colleague Wilma Irvin, represent the mother in this Hague Convention action, the appellant Maritza Mezaros Reyes, who is here with us today also. This appeal, your honors, calls into question, as we've said in our briefs, two very important things. The party's children and the country of their habitual residence under the Hague Convention on the civil aspects of international child abduction. As well as, secondly, this court's most valuable precedent in Maxwell v. Maxwell of 2009. And if your honors please, I will synthesize the most basic of the relevant facts. What period would you have us look at? 2008, 2011, 2006, 2008? What period would you have us focus on for your argument? For my argument, I would have you focus on the entire period of the party's marriage, as well as the last three years that the family lived together as a unit. Your answer would be what? Because the judge below said you focused largely on 8 till 11, correct? The judge... That's your own reconsideration. At least, maybe I'm not reading the record correctly, but I thought the judge suggested that the case was presented that he most had to focus on the years 8 to 11, but that after the fact, he was sort of somewhat perplexed that it looked to be a shift of focus to 6 to 8. Now, did I misread? Your honor, honestly, I don't read it that way. The judge did say that the party spoke heavily on the last three years, that being 2008 to 2011. The father's theory of the case was that about 2001 or 2002, some 10 years ago, the family began to manifest a settled purpose to change habitual residence from Venezuela to the United States. It was the judge himself, I believe, who came up with a focus on the years 2006 to 2008, finding that the children's habitual residence had changed during those years for basically one reason, that they were living with their father, not their mother, but with their father in Lexington, South Carolina, to attend middle school, and were going to stay there until the oldest son finished middle school. So the two youngest children attended that school for two years. They traveled during that time back to Venezuela, where their mother had purchased a very large condominium for them, and returned... During the period of 6 to 11 then, do you think there was a change in where their residence was? No, your honor. I think it was always where. Our position is that habitual residence initially was Venezuela, always remained in Venezuela, and that the court erred in not applying the first step of the framework set out in Maxwell, adopted from Moses. But Maxwell says that the standard of review is clearly erroneous. On factual matters, yes, your honor. On the determination of habitual residence. However, in reading Maxwell very closely, and it also relies on Moses, and Moses makes it very clear that the concept of habitual residence, while heavily factually resolved, is indeed a legal construct. And Moses... That's not what Maxwell says. Maxwell says this is subject, the determination of habitual residence is subject to clear view for clear error. So are you asking how do we deal with that then? Your honor, I interpret Maxwell as not saying that the... We're arguing that the error... That Maxwell's Fourth Circuit. I understand, your honor. Moses' Ninth Circuit. I mean, and we've got... I understand, your honor. And I interpret Moses as saying not that the legal construct of habitual residence be determined for clear error. I interpret it consistently with all the other cases that it has relied upon. And the error here was an error of law because the district court here did not apply the test that Maxwell has adopted. Okay, but Maxwell says, and this is at page 251, the crux of the issue on appeal is whether the district court's determination that the children's habitual residence was the United States at the time they were removed from Australia is clearly erroneous. So the court was talking about habitual residence, and it was imposing a standard of clear error. It seems to me we're bound by that because we've got the issue of habitual residence here, and we have the Fourth Circuit saying the standard of review is clear error. So tell me why that doesn't apply. The reason I don't think it applies is I think we're talking about two different things. Well, look at that sentence. If your honor wouldn't mind, if you could refer it to me. I've got the case right in front of me. Yeah, it's at page 251. It's the paragraph beginning with specifically, but in particular the sentence at the end of that paragraph beginning with thus. And perhaps you'd like to address it on your rebuttal and not use your time. Thank you, your honor. I will do that. But my main point, I read Moses last night for about the fifth time. Let me say to you, too, I'm looking at the reconsideration. Let me tell you why I asked you that question. I look at the reconsideration in order by the judge below, and it says the court takes this opportunity to expand on its findings that the children were habitually resident between 2006 and 2008. And then he goes down a couple paragraphs later and goes, during the trial the parties mostly focused on the period from September 8 to September 11. That's where I got the idea. That's what he thought, and you said you didn't. He thought that, but I want you to understand that's why I got the question. It looked to me like in the motion to reconsider, I read that as saying you focused on 2008 to 2011, and now you're making different kind of arguments to me, right or wrong. That's where I got that idea. I understand, your honor. Now, if you make the point to me on you think from 2006 to 2008 is your argument that the children were or were not, had not established a residence in South Carolina. Under the established law, they had not established a residence in South Carolina. The judge did not ask the important question. Do you think that your client considered South Carolina at that point to be where her primary residence was? Absolutely not. Her primary residence was never in South Carolina. Did she apply for a loan in which she indicated that the loan was for the purpose of her primary residence? There are facts peculiar to her existence in South Carolina. I didn't ask you that. I said that she signed a loan application in the period of 2006 to 2008, which loan application for the bank she reviewed. She's an attorney, isn't she? She reviewed it, and she signed that the purpose of the loan was for a primary residence in Lexington County, South Carolina. Yes, your honor, and that is absolutely true, but she also had a primary residence in Venezuela. Let me ask you this. Would that be bank fraud? No, your honor, because Would it not be bank fraud to claim primary residence when it's not your primary residence? It's primary residence within the United States, not primary residence internationally. Is that what that document says? I don't know what that document says, your honor. I apologize. I would have to look at it again. Have you seen it before? Yes, I have seen it, yes, sir. But she signed, so during the period of 2006 to 2008, were the children attending a brick and mortar school at that point in South Carolina? They were, your honor. Okay, and during that same period of 2006 to 2008, she signed a loan document indicating the loan from the bank was for the purpose of funding her primary residence. Does it say primary residence in the U.S., or does it say primary residence? Your honor, I really don't know. I would have to look back at it again to make sure, but my point Have you ever signed a loan document when they ask you, it's going to be your primary residence? Personally, I haven't, no. In the U.S.? I've never seen that asked, and by the way, I think that loan application, I think it's not in this record, because I've looked for it, but I think it's not in this record. It's not in the joint appendix that I'm familiar with. But if she did sign, what are we to make of the fact that she signed, that the children were in fact attending a brick and mortar school in South Carolina from six to eight, and the mother of the children signed for a loan indicating that she was seeking funding for her primary residence? Oh, your honor, I'm sorry. I don't know if it was her primary residence, but it may have been a primary residence in the United States. Well, who is it for? She's the one signing the loan application. I'd love to answer your question, your honor, because I think it's very important, and Moses tells us how to do this. Moses says that there has to be consistent interpretation of the term habitual residence across the United States and internationally. My question is what do we make of those facts I just gave you? Well, the important fact is that permanent residence is irrelevant. The question is habitual residence, and in this case, the father has repeatedly confused the terms permanent residence, residence with habitual residence, and importantly and very seriously has misconstrued the record with a major quote from an exchange at the end close of the evidence between the judge and counsel by inserting the term habitual residence as opposed to residence, and they have not corrected that, your honor. But that doesn't answer my question. Still, I'm going to ask you one more time. Yes, sir. But what are we to make of that in analysis that the children attended a brick-and-mortar school, this is secondary type school, not college, secondary school, and that the mother during that same time period signed a loan document indicating she was seeking, that clearly indicates her primary residence was going to be in that location in Lexington County? Two points, your honor. The first, I believe I just said, permanent residence, it does not equate and should not equate ever to habitual residence. I have not used permanent residence at all. I thought you were saying, oh, primary, I'm sorry, primary residence does not equate, neither does permanent residence, neither does domicile. Her tax attorney found that she was a non-resident alien. Is primary residence, her indication of that, is that evidence of anything in your mind? I think. When she signs a document saying that home in Lexington is going to be her primary residence, is that proof of anything? Under the facts of this case, it is not. It is not relevant because the issue is whether or not the parents had a joint, settled, shared intent to abandon an existing habitual residence. The judge did not do that analysis. He didn't ask that question or any of the subsidiary questions, and more importantly, your honor, with respect to the narrow question that you have asked here, those two years, the judge should have said, or should have asked, and he did not, what was the purpose of the children's being present in that school at that time? He should have asked, under the test in Maxwell, and adopted in, Maxwell adopting Moses, whether or not those two years were for an indefinite period, in which case it might have become habitual residence, or whether those two years were for some settled, definite purpose. And if the judge had asked the questions that he should have asked under the law, the established law in this circuit and in the majority of circuits, the answer is clearly that they were there because the mother and the father agreed that the school situation required it, and they would only stay there for two years, the younger two children, two years until the older child had finished middle school, at which point it was to be decided where the older child was going to be going to high school, and that was the perfect point. The father no longer working, the father in theology school, the beginning of a construction of a home that the children and the father only lived in for, at most, two months. So the two facts I raised in your opinion are not relevant at all to the proper inquiry, even if the judge made the wrong inquiry. Those two points that I've just asked you about in your analysis aren't relevant at all, that the children lived and went to a brick and mortar school, and that the mother indicated, at least indicated that would be her primary residence. In your analysis, those factors don't matter at all. I don't believe they do, if the proper questions are asked. In other words, you would be the same, your argument would be the same, if the children had lived in a foreign country for those two years, and the mother had signed a note and a loan asking for a primary residence there. Well, again, it all goes back... I'm not arguing with you, I'm just saying it would have the same effect in your analysis. Unless that foreign country were their original habitual residence. I mean, those factors could indicate that a prior habitual residence had not been abandoned. But under the same circumstances as this case, the fact that they were living in Lexington and she applied for a home in Lexington, that doesn't mean anything more than had the children been living in Venezuela. Venezuela. And the mother and the husband had applied for a loan for their primary residence in Venezuela. Those fact patterns would be exactly the same for any analytical purposes. I believe that's true, except that here the important difference is that we have to ask whether that former habitual residence, and it's indisputable that that was Venezuela, had been abandoned. If that had happened in Venezuela, that would tend to show that Venezuela had not been abandoned. And the last three periods, I do want to say this, those last three years, Your Honor, that is also relevant because those were the periods that showed the last shared settled intent of the parties. And in reviewing all of the case law, that is always a factor. I'm sorry, my time's up. All right, thank you. Sherrod? Sherrod? May it please the court. Judge Keenan, you hammered it. Look at Maxwell. You pointed out the absolutely conclusive determination for this court. The crux of the issue on appeal is whether the district court's determination that the quadruplets habitual residence was a U.S. at the time they were removed, whether that's clearly erroneous. The U.S. Supreme Court in 1985 on certiorari to this court specifically said where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous. All the points that Mother made in the very beginning of this case through trial in this appeal are facts that favor her point. There are plenty of facts, as I'm sure the court is aware from the dozens of pages in both briefs on which each side relies to show the habitual residence was in the U.S. at any point because once it becomes at any point, she has to prove that it changed. And Judge Anderson specifically said in his order, and Judge Shedd, you referenced this, the court takes this opportunity to expound on its findings that the children were habitually resident in the U.S. 2006 to 2008. In the Maxwell case, Judge Seymour of South Carolina sitting by designation said whether the parents shared a settled intention to abandon the former country of residence is a determination on a clearly erroneous standard. And I will say that I did inadvertently use the word habitual in front of the word residence in the exchange between Mr. McLaurin and my partner Tim Madden. But that ultimately doesn't matter because the exchange was about whether or not there had been an abandonment of the former country of residence. Judge Seymour did not say former country of habitual residence. She said former country of residence. And so the exchange appropriately says that's not an issue. They do not dispute that the former country of residence was the U.S. from 2006 to 2008 is what the time period they're talking about. And Mr. McLaurin on behalf of the appellant says short, brief period of time. Venezuela, U.S., Venezuela. The entire trial was about 08 to 11. We got bar graphs. We got pie charts. We got photographs. The entire thing is about 08 to 11 because the appellant knew. She knew she had to prove that that is when the change happened from the U.S. where it had been in 06 to 08 at least to Venezuela from 08. So you think I'm correct in at least sensing some sense of frustration on the part of the judge who thought he tried this case about 08 to 11 largely and then reconsideration wants to shift the focus to 06 to 08 or some such thing. Judge Anderson has been on the district court bench for 27 years. I didn't ask you that. Yes, sir. I didn't ask you that because I served with him all before of it on the federal court system. I don't think I asked you that, did I? No, sir. I said do you think I was correct or incorrect in reading the fact that he thought the trial had been about 08 to 011 and then suddenly he saw on a motion to reconsider or otherwise that the emphasis was being shifted to 06 to 08? Correct. That's exactly right.  and 22 witnesses testifying to all of a sudden be presented with this argument in a post facto rationalization that oh, wait, wait, wait, wait, we didn't mean it that way. And you can look at this starting from her amended verified petition. Again, she is a lawyer. She verified that petition. She not only told the bank that about the loan, she told the U.S. government that she wanted a permanent resident card. And then in this appeal has said that was for convenience of travel purposes. There are probably millions of people on the face list right now who would kill somebody for a U.S. permanent resident card. She went into the Floyd Spence post office in Lexington, South Carolina, held up her hand, was administered an oath in 2009, and said the children's permanent residence is Lexington, South Carolina. We do not agree that the term permanent residence as used in sworn documents given to the U.S. government is irrelevant. It is absolutely relevant, particularly because it goes to the credibility of the witnesses. And again, Judge Anderson heard 22 of those over his four days of adjudicating this matter. It seemed like the decision was to educate their children in South Carolina. Do you think that equates to habitual residence alone? I don't know that it equates to habitual residence alone, but Judge Anderson didn't just find it on that point alone. He went through every single factor listed by the Maxwell Court on both the shared parental intention prong of element one as well as the acclimatization prong. What was the father working during this period you said he focused on? What was he working? The period of 06-08? No, the last period, the one that Judge Shedd said it seemed like that's what the judge was focusing on and then tell the reconsideration. What was the father working, 08-11? 08-11, the father was not employed. He's not employed. So the mother is taking care of the family. That is true in that she is working and certainly using her resources, but these parents, these parties had tremendous savings noted by the fact they have a million-dollar house they signed a construction loan on but actually has no debt on it. They had tremendous savings and that was the family plan is that all this money she made as the first partner at this largest law firm in the world in Venezuela which she only paid taxes on in Venezuela based on this tax treaty. All the money they made was going into savings and the plan was that she would transition out of her full-time practice and as he was the city executive for BB&T, a large bank certainly in South Carolina and he was going to go on to seminary and be... But he wasn't working. Correct. And the mother is taking care of everybody. I can't agree with you on that individually. She certainly was working and her income was being used to support the family. It would be an erroneous finding to find otherwise that she was taking care of the family as a professional there and he's trying to establish himself but it seemed to be an habitual residence in something else. You know, my daughter is in North Carolina and they're in school but she's a resident of Virginia. She's not a North Carolinian. She's there for her education in North Carolina but she lives in Virginia. So a lot of people send their children to other places to be educated. There are people from all around the world but that doesn't make it your habitual. So what I'm concerned with, and I agree, is the standard is erroneous error but it is a legal finding as to what is habitual residence. That's a legal determination. Would you agree with that? Candidly, it's a little bit confusing in that there's no question under the precedent of this court, and as Your Honor said earlier, you are bound by the precedent of your dear circuit and this panel cannot overturn the published opinion of a previous panel. It specifically says the shared parental intent finding is a finding of fact which is a subset of habitual residence. But this court in Miller also said that habitual residence is, there's no, quoting here, no real distinction between ordinary residence and habitual residence. So there is, and in fact the report, the Vera report of the Hague Convention itself specifically says that habitual residence is purely a question of fact. Well isn't it true that if you have a college student go to a school in another state that might be slightly different? It might be subject to a different fact finding if one of the parents moved there with the child and carried on a normal life. Absolutely, and that's why. And isn't it true in this case, there's at least evidence in this case, that the plan was during the period of 2006 to 2008 at which point they were applying for the loan for both parties. I don't see the loan application, but the testimony in the record is I think the only inference. Both the husband and the wife signed for that loan as a primary residence. As an aside, it matters. You go and buy a second home, you see what the interest rates are on a second home compared to a primary residence. Insurance rates and everything, it matters. And it matters to a bank. But from 2006 to 2008, during that time period when they were applying for that loan for that primary residence, apparently it's going to be on the lake somewhere in Lexington, from what I could tell, a nice home. The plan was then that the mother was going to migrate. I'm careful of the word I use. She was going to end up in Charlotte or somewhere working for a law firm handling her international clients in this country. Isn't that correct? There's evidence in the record of that. If you know, say yes. If you don't, say you don't know. Yes, there is evidence in the record that they applied for a loan with a bank and called it... That wasn't my question. My question was during that time period when they did apply saying it would be a primary residence, that it was an indication she was planning to move her law practice to the U.S. There is evidence in the record of that, yes, sir. Of course, this entire argument that the appellant has made so far and what I've made in response has been about habitual residence, which is just one element out of three. She is required to prove, she has the burden of proof to prove the second element and the third element in order to get relief under ICARA. And that's where, in fact, in the Maxwell case, Judge Seymour stopped her analysis because this court can stop its analysis once you get to a determination that it was permissible for Judge Anderson to view the evidence the way he did and therefore it's not clearly erroneous and y'all can't substitute yourselves for him, then you don't even have to get to elements two and three. But even if she was successful in habitual residence, which we certainly don't believe she is, she did not prove elements two and three. Judge Shedd, you were off of the opinion in Bader v. Kramer and, Judge Kannon, you were just on the panel not six months ago in Sudebay White's case. Those entire cases, habitual residence was uncontested. And so it's not just some sort of, oh, element one's the big deal, element two and three, no big deal. I mean, it's a prima facie case. Either you prove it at trial or you do not. And here there is no proof of elements two and three and those issues are not on appeal anyway. And so no matter how this court goes about dealing with it, she cannot prove that Judge Anderson was wrong in his view of the evidence and therefore it's not clearly erroneous on the shared parental intent, which is the standard under the 2009 case of this court published opinion. But even if she could do that, she can't prove element two and she can't prove element three. This court should affirm Judge Anderson. You would concede, though, in 03 to 05, Venezuela was the habitual residence? I would not. You would not? No, sir. Where did they live? What was the habitual residence? In our version of the events, the habitual residence changed beginning about 2000-2001 when he could no longer, or when she and him, moved to Greenville, South Carolina from to take a job for two years. And during that two-year time period, she affirmatively asked the U.S. government for permanent residence, which means the privilege of living in this country. All right. And he let his resident visa in Venezuela lapse. So since 2003, he's not been able to live there for more than 90 days or be employed there at all.  The only period of time that the children lived in Venezuela during that time was 03 to 05. None of these kids have been to a Venezuelan school since 05. That's what I asked you. 03-05, you're saying they lived in South Carolina? The children during that time period, the family had moved from Venezuela to South Carolina from 01 to 03. There were some parents that had gotten ill. I know that. Can you answer my question? 03 to 05, you're saying they lived where? The children resided in Venezuela from 03 to 05. Okay. So their habitual residence was there, correct? I can't agree with that. I'm sorry. Why not? Because we don't. Well, two reasons. Number one is the judge didn't address that. Okay. But the second reason, which I think is more important. So he does because if that was the established habitual residence, then the burdens that showed it was supplanted at some point to another place. And that's the problem, isn't it? Well, he found that as of 06, approximately 06 is what he said, is when the change occurred. So what I think about it doesn't really matter in that the judge found that from 06 to 08, they were habitually resident in the U.S. We're not bound to an erroneous legal finding. Otherwise, there would be no purpose for appeal. I agree. What facts were in dispute that he found that we were bound to? What fact? There are tremendous. Erroneous. The legal conclusion is still up to us. It's whether he was wrong about that, clearly wrong about that. But what fact in dispute did he decide that we're bound to? What fact? I don't know that he actually. None, obviously, none. It's a legal conclusion as to what was the habitual residence. But what fact are we bound to? The facts that he found are detailed out in our brief from about page 35 to about page 40, where he goes through each and every one of the factors the Maxwell Court told him to go through to determine whether or not there's a shared parental intention to abandon the former country of residence, not the former country of habitual residence, the former country of residence. And again, her own lawyer in his closing said, short, brief period of time, Venezuela, U.S., Venezuela. They acknowledge the former country of residence is the U.S. under that analysis. I'm glad to answer any further questions. Otherwise, that concludes my argument. That's all. Thank you, counsel. Thank you. Ms. Fullman, you have some more time. Thank you, Your Honor. I'd like to answer Judge Keenan's question now that I've found that passage that I believe, Your Honor, was referring to in the Maxwell case. Please correct me if I'm wrong. What I see is that the statement is, we cannot conclude that the district court was clearly erroneous in its conclusion that there was no- the paragraph beginning specifically. And the sentence at the end of that paragraph talking about the crux of the issue on appeal is whether the habitual residence determination was clearly erroneous. I'm having a hard time putting my finger on it. C252. Right at the top of 251, that sentence beginning with thus. C251. Mm-hmm. The top of specifically the petitioner must establish? No. Why don't you just take that as a given? She's read it to you. Yeah, I take that. I do take it as given, but I'm- At the end of the paragraph, you just identified it. All right. I'm looking at the language here where the Maxwell court, this circuit, they cannot conclude that the district court was clearly erroneous in its conclusion that there was no shared parental intent to abandon the United States. Right, and that's why I'm referring you to this language because this language talks about the habitual residence determination, the basket of the shared parental intent and the acclimatization. And that's why I wish I- The habitual residence determination is subject, they say that the crux of the issue is whether the determination of habitual residence is clearly erroneous, and I'm asking you why we aren't bound by that. Not being able to put my eyes on it exactly, I'm a little bit- Would you like to, you know- I hate to waste your time, but I believe you. It's right at the top of 251. 251. It's the first complete sentence on 251. I see. It begins with thus. I see it. Okay. I see that. That is true, Your Honor, if the court undertakes the required analysis, which is to determine whether or not the prior habitual residence was abandoned. If we look at the paragraph on standard of review, we see that the court is citing established law and says that conclusions based on fact, pure fact, are reviewed de novo. Right, but you see that in every opinion of this court. That's why I'm asking why it is not particularly significant that when the court narrows the issue of review down to the habitual residence determination that it then says it is for clear error. Why did the court do that if that's not what we're bound by? Because I think what the court is saying, and it has to be saying in light of Moses, which the court relies heavily on. It is, but it is the source of this opinion. There's no cite to Moses for that proposition. There's a cite to Moses in the standard of review, and it refers also to Fetter, which filed- The boilerplate principle Moses has cited for, the boilerplate principle of legal conclusions versus factual findings. True, but- It sounds like you just want to argue it. You don't want to address the legal issue. I'm sorry I'm having a difficult time understanding it, but what I understand from looking at the law, the law that was adopted by Maxwell, is that the concept of habitual residence is a legal construct. It is certainly informed- Why did they say it's reviewable for clear error? Were they wrong? All I know, well, there are a couple of statements in here that are incorrect. One is what opposing counsel has pointed to, that being, you look at the former country of residence, and Mitley cites Moses. It's obviously the former country of habitual residence. So some of the language may just be aligned with what the facts of Maxwell are. That's all I can suggest. But what I do know for a fact is that the failure to do the required analysis is a legal error and not an error of fact. If the analysis is done, then the court could reverse for clear error, based on errors of fact. But if the analysis is not done, Your Honor, we have to- Well, Joe Anderson, Judge Joe Anderson, did some analysis, correct? He did not do the analysis that was required- Did I ask you that? He did sum it out. Certainly he did. He's a wonderful judge. So your argument is then that the analysis he did, which is rather detailed, he completely missed exactly what test he was to apply? He did not apply a single appropriate test, except at the end, after he concluded, sort of out of the blue- Just stop for a second. Tell me the one most egregious thing that he should have fact, that he did not appropriately analyze? I believe that his most egregious mistake, Your Honor, was that he decided that the facts of this case, simply because the parents were wealthy and had more than one very fine resident- No, that would have been a fact. No, I'm asking you a fact that he should have analyzed to make his conclusion, the right kind of analysis, which fact he did not consider. I'm not asking you to surmise what he did and didn't do. I'm just referring from his opinion. He said that he did not undertake the analysis required by Maxwell, which he did quote in his opinion. It's right there, those two points, the first one and the second one. He said he did not do that because he felt that the facts of our case were significantly different from those in other jurisdictions, and they are not- That the family could travel a good bit. Travel a good bit, were wealthy enough to have two homes, but he did not engage in the analysis that is set out in Maxwell, and that, Your Honors, and Judge Keenan, is an error of law. If he had done that and reached a conclusion- I don't understand. It's an error of law that he did not engage in the required analysis. But what are you saying is the required analysis? Point me to the language in Maxwell that you're saying is required as a matter of law for a trial judge to do in determining habitual residents. All right. The first step, I'm looking, instead of referring to pages, the category shared parental intent. Right, but I'm asking you for a statement of law in Maxwell because you're telling us that as a matter of law, Maxwell says that the district trial judge has to perform a particular analysis, and if does not do so, is clearly erroneous. And I'm looking for this analysis. Well, I will show you as best I can. In that section, number one, shared parental intent, second paragraph. Well, actually, I apologize. If you look at head note number four, the framers of the Hague Convention intentionally left the term undefined, and it says federal courts have developed a two-part framework to assist in the habitual residents analysis, and under that framework, the first question is whether the parents shared a settled intention to abandon the former country of residence. See Moses. Okay, that's a factual determination, their intent. Okay, so what else in Maxwell? Well, the analysis would involve a factual determination, but the fact that the analysis is not done is an error of law. I get this all the time, Ms. Palmer, where lawyers argue that there is a legal construct involved. We got this in criminal cases yesterday, where people are saying that it automatically becomes an issue of law because the court has to consider several factual matters. It doesn't. If there is a legal analysis to be applied, it involves definitions. It involves other determinations other than a compendium of factual findings. And I'm just asking you for guidance. I need your help. You've dealt with this case a lot longer than I have. Show me where in Maxwell there is an analytical construct that is more than simply a compendium of facts for the court's consideration. And in my mind, that is this two-part framework, and there are also other subsidiary questions within that two-part framework. That's a legal analysis that must be undertaken. I know you don't want me to go back to Moses, but I need to go back to Moses. That's okay. I understand your point on Moses. Moses is extremely helpful. May I just conclude? Yes. Your Honor, I believe it was Judge Shedd that you asked opposing counsel if there was any evidence that the mother was planning to move her practice to the United States. And the record, absolutely not. That's not correct. There absolutely is. There absolutely is. I can tell you. I can find it and cite it to you because I've read it in the transcript myself. Where there was a discussion. How would I know this? There was a discussion that she was planning. I think the banker said this, that the attorney was planning to come back to the U.S. and she was going to operate out of Charlotte or maybe Atlanta, some other town, where she could service her clients. Okay. And Judge Anderson said there was a shared parental intent in 2006. Did he not? He said there was a shared parental intent that the children come and go to brick and mortar schools, but that is a temporary situation. No, shared parental intent to move the children to South Carolina. In 2006 to 2008, there's two scholastic years. Right, and then the spin you put on it is you say it's because they just want to stay temporarily and the father puts the spin. It was going to be permanent. No, Your Honor, the evidence is very clear. Or that they were going to stay for a while. They were going to stay for two years until the oldest child finished middle school. And the father acknowledged that in information that he gave to the mother's tax accountant. He says the mother has decided to send the children here because of the school situation. And the analysis, again, the legal analysis that should have been done was to ask whether or not that was for a temporary purpose or some ambiguous indefinite purpose. But didn't Judge Anderson have the other facts that they were getting this primary residence that they even continued to homeschool the children under the South Carolina law when they were in Venezuela? But it was in Venezuela. I mean, it was the only place, Your Honor. But they were doing it to comply with South Carolina law. Isn't that very powerful evidence? I do not think so, Your Honor. I do not think that whether the children consider them Americans, whether the school system they operated was under the law of China. They were in. But they were trying to establish South Carolina residency for those children in the event they wanted to. The children were dual citizens. They were dual citizens. And that is one of the more unique factors of this case. Let me say this to you. Yes, Your Honor. I don't know about moving back, but it certainly was an inference that she was going to be back here to practice law until page 577. And this is the bank person talking, Ms. Shapiro. I'll read it to you. They had that. I don't remember. She said they or her, so don't quote me on that, but that they thought about since her practice was in Venezuela, she had taken a couple of years off from her practice and that she might get a certification where she could practice law in the United States and still work as a partner in her firm in Venezuela and possibly work out of New York, Atlanta, or Charlotte. Your Honor, I accept every single word you have read. Those are future thinking issues that never came about. They were not settled. I didn't say that. When you got up and said that what I said, and I said that her intention was that this is the question I asked during the time period of the loan, and I used that time reference because it was the loan officer who gave that testimony. And I said, wasn't there a suggestion or whatever that she would be moving to the U.S. or come back and practice? And I take that from the words work out of. And by the way, you cannot say, no matter what you want to say, that a fact finder could not take a reasonable inference from that be it necessary to your analysis or not. That's a reasonable inference that she was going to move back to the U.S. to work. Don't you agree? A reasonable factual inference. If that were a settled intent, but I interpreted it. I didn't ask you anything about settled intent. I said a reasonable inference, which was my question, and you got up and told me absolutely not in the record. But it is too in the record. Your Honor, what I meant to say is there is no evidence. I don't know what you meant to say, but I know what you said. There was no evidence that she was planning definitely to do this is what I'm trying to say. But just let me say this. That may be right or it may be wrong, but a fact finder could take from that testimony or it would be a reasonable inference that she was going to come and work out of and practice law in Charlotte or Atlanta or New York. You might argue against that, and you might say even that if she came and worked out of that, that wouldn't be enough. But I don't see how you could argue that that would not support a reasonable inference, not that it's necessary to the whole issue of the final question, but of the question that I asked. Let me ask this of you. Do you think that evidence, that testimony, is some evidence of her intent at some point after that loan application to come back and work out of the U.S.? Yes or no? I just can't answer that question, Your Honor, because the legal question has to be whether there is a manifest... I'm not asking that question because the answer to my question is a simple question of what is a reasonable inference from a statement in testimony? Now, you may have another argument about whether or not that reasonable inference has to be found or that reasonable inference, if found, is sufficient or even relevant, but I'm not asking you about all of that. If there was evidence that she said she intended to do that and that was certain enough, settled enough, the question is whether it's settled. Then I do believe... May I suggest to you, you are entirely wrong. I apologize, Your Honor. For a fact finder to find from that that a woman indicates that she plans to come back and work out of Charlotte or Atlanta, you think that a fact finder could not take that testimony alone to be a reasonable inference that she was going to move physically back to the U.S.? I do think that the fact finder could conclude that there was a reasonable inference that she intended sometime in the future to do that. And Your Honor has recognized that what I'm saying... But that's all my question was. When you got up and said there was no evidence to that effect... I'm sorry. I must have misunderstood the point. Ms. Fulmer, I'd just like to say one thing. Perhaps this is from my experience as a trial judge hearing cases where this exact same thing has been made. There's no question that these are among the most difficult decisions that a trial judge has to make where you have two good parents. They are the worst, most heart-rending, most difficult cases judges hate to make them. And there's no question they're two excellent, fine parents in this case. And Judge Anderson had a very difficult call to make, I'm sure one he didn't want to make in the first place. And that's absolutely true. The record reflects that, Your Honor. He said several times that this was one of the most difficult cases he had to decide, which is precisely why this court needs to confirm the application of the proper framework to determine where the habitual residence in a previous country has been. So your argument is he was having so much trouble deciding it because he was deciding it wrongly? No, thank you. I love Judge Anderson. I'm not sure why he did it. That's why I don't like to mention district court judges by name because to me it's of no moment. The question is whether or not in terms of the law. But the issue is this. Obviously Judge Anderson is a fine judge. That's not even before us. That's without pervention you can say that. The point is this. I think that's the reason for the Hague Convention is that this is a difficult question about the things that Judge Keenan is talking about, but really it's not because the Hague Convention is not about who is the best parent. That's for some other decision. This question is for the state put in terms of a person going back to where they're resident. It's not that issue. You don't get into what the children think. It should tip the balance. No, it shouldn't tip the balance because the question really is, and I think your answer to Judge Shedd's question is all those things about aspirations where I might work, that's a process in being that might come about. The question is right now where it is. Families do that all the time. Okay, honey, you're trying to do something in the United States. I support you. Go ahead and do your thing. You're the best person right now to have the children go to school right there. But we live in Venezuela, and I'm supporting the family. So that's what the Hague Convention says. You can't just take that and say, well, I'm in the United States now. I've now established a habitual resident. And the analysis you're talking about is that one, not whether or not the wrenching question of which of these children who's the best parent, that's not what the Hague Convention is for. And I don't think there's a single opinion anywhere that disagrees. In conclusion, I'd like to say one thing, and that is not only does it defy common sense, but I have found not a single case that concluded that habitual residence of children changes when the child moves away from an established habitual residence to study for two years, as the parents agreed, leaving behind one parent whose goal, like the other parent, was to live together someday. They did that. And that parent continued to support the family. There are cases. I've cited them in my brief. Moses, the Hoffman case, Poliero, are all consistent with our theory of the case. And I thank you very much. Thank you very much. We're going to ask the clerk to dismiss the court. Senator Dyer, then we'll come down and recount. This honorable court stands adjourned on the die. God save the United States and this honorable court.
judges: Roger L. Gregory, Dennis W. Shedd, Barbara Milano Keenan